UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL ELLIOTT, #613346,

        Petitioner,

v.                                  CASE NO. 2:10-CV-11782
                                     HONORABLE PAUL D. BORMAN

BLAINE LAFLER,

        Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY, AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

### I.    Introduction

Michigan parolee Paul Elliott ("Petitioner") has filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that he is being held in violation of his constitutional rights. Petitioner was convicted of aggravated stalking, MICH. COMP. LAWS §750.411i, following a jury trial in the Isabella County Circuit Court in 2008 and was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to two to five years imprisonment. In his pleadings, he raises claims concerning the effectiveness of trial counsel for failure to object to the jury instructions and the validity of his habitual offender sentence. Respondent has filed an answer to the petition contending that it should be denied.

For the reasons set forth, the Court concludes that Petitioner is not entitled to federal habeas relief on his claims and denies the petition. The Court also denies a certificate of appealability and denies Petitioner leave to proceed *in forma pauperis* on appeal.

## II. Facts and Procedural History

Petitioner's conviction arises from his contact with a woman at the Church of the Latter Day Saints in Mt. Pleasant, Michigan on May 23, 2007. The Michigan Court of Appeals described the case as follows:

> Defendant was convicted of aggravated stalking of another woman in July 2006. The victim in the current case testified against defendant in that earlier prosecution. Shortly after, the victim in the instant matter sought and received a personal protection order against defendant in August 2006. Subsequently, on May 23, 2007, defendant was found on the grounds of a church at the same time that the victim was there. Defendant was arrested and charged with aggravated stalking. At trial, defendant's defense was that he was on the church grounds for a legitimate purpose and that his presence at the church was a "constitutionally protected activity."

*People v. Elliott*, No. 283910, 2009 WL 1717386, *1 (Mich. Ct. App. June 18, 2009) (unpublished).

At trial, the victim, the victim's husband, the victim in Petitioner's prior stalking case, church members, and police officers testified in support of the prosecution's case, and Petitioner testified on his own behalf. Defense counsel on direct appeal summarized the trial testimony as follows:

> Officer Brandon Talty testified that he was called to the Northwest Apartments on a potential stalking complaint on May 23rd. There, he met Elizabeth Pilling. She said that Defendant had violated a personal protection order; she appeared "very upset and distraught about [Defendant] having been at the church." He learned that such an order had been entered against Defendant as regards Ms. Pilling.
>
> Elizabeth Pilling testified that she had been an apartment supervisor for Central Michigan University at the Northwest Apartments for two and one-half years. She met Defendant in 2005; he was a tenant at those apartments and attended the same church (Church of the Latter Day Saints) that she did. On October 31, 2005, her husband told her something about Defendant; she went to Defendant's apartment to see if it was true. She asked Defendant if he had sent letters to Candace Baldwin. Defendant said that he had used the name "Melissa" to send Ms. Baldwin emails. He showed her the emails and showed her Ms. Baldwin's responses. The witness had not known Ms. Baldwin, but Defendant told her that they "had been dating" but had broken up; he was upset about it. Ms. Baldwin had obtained a PPO against him, but he "wanted to make things right." Defendant said that he was "being sneaky;" Ms. Baldwin did not know that he was "Melissa." The witness knew the real Melissa. The

witness told Defendant that he should not be doing that. She reported his statements to her to the CMU police. Defendant sent the witness an email asking her not to tell Melissa or Candace, saying that he would talk to them. Defendant began coming to the apartment the witness shared with her husband more often. Often, he arrived right after her husband had left. She received a total of 13 or 14 emails from Defendant. Usually, they were about him wanting to talk about Candace. In March of 2006, the witness sent Defendant an email saying that she had nothing to say to him and asking him not to "stop by" unless it was related to the apartment. It was "very upsetting" to her. She and her husband had printed and posted a schedule so that tenants would know how to contact them. The schedule indicated when she was at church; Defendant knew which church she attended. She was to testify against Defendant in July of 2006. He called her the day before her testimony and asked her how she could "turn in" the letters he had sent her. He called again, but she hung up. She called the prosecutor and testified the next day. On the following day, Defendant came to her apartment around noon. She shut the door and called her husband, the prosecutor, and police. She wrote a statement at 12:50 indicating that he arrived at 12:05 p.m.

Over Defendant's objection, Plaintiff introduced a transcript showing the taking of a verdict at Defendant's 2006 trial at 12:09 and 12:14 p.m. The transcript indicated that Defendant was not present in court.

She testified that Officer Martinez arrived at her apartment that day (the day after she testified), and she went with him to talk to Defendant. She told Defendant to have no contact with her, direct or indirect, that he was banned from Northwest Apartments (he had previously been evicted) and that he would be arrested if he came on the property.

Over Defendant's objection, a July 14, 2006, judgment of conviction and sentence for aggravated stalking was introduced.

Ms. Pilling testified that she obtained a PPO against Defendant in August of 2006. The order (Plaintiff's Exhibit 3) and a proof of service (Plaintiff's Exhibit 4) on Defendant were entered in evidence over Defendant's objection.

She testified that Defendant was in jail most of the time from August 2006 to May 23, 2007. On May 23rd, she went to her church for "ward cleanup night." The schedule that she and her husband posted near their apartment indicated that would be at church that night. She was supposed to arrive at 7:00 p.m., but arrived at 7:25-7:30 p.m. She saw Defendant near a bike rack . She made eye contact with him and moved away to "the other side;" from that position, she could not see the bike rack. Many people were in the area. When she looked again, Defendant was on the sidewalk not far from her. He was "staring at" her. She asked Kimberly Jensen to call her father, Bishop Jensen, who was nearby and knew about the situation. Bishop

Jensen went to Defendant and spoke with him. The witness and others went around the side of the building. After 10 minutes, she went back and Defendant was still standing there. The witness went back to the other side of the church and helped some other people. When she came back to the side she had previously been on, Defendant was still there talking to people. She went to Jerry DiMaria and told him that either Defendant had to leave or she would leave. Jerry spoke with Defendant and Defendant left on his bike.

She and Defendant were members of the same church, as was Candace.

Gregory Pilling testified that he is Elizabeth's husband. Defendant told him about sending emails to Candace; he told his wife of the conversation. She told him that she was going to tell Defendant that he should not be doing that. They both posted their schedules so that apartment residents knew when they were available. In the middle of the court case in which his wife testified, she phoned him. Over Defendant's objection, he testified that she was upset and told him that Defendant was on their doorstep; she wanted the witness to come home immediately. He went home and spoke with Defendant. He asked him if the trial was over; Defendant said it was not. Defendant told him that he saw Mr. Comer at the trial; Comer was smiling and Defendant said he wanted to strangle him. Defendant told the witness that he had come to their apartment to tell them that they could keep the TV stand he had left when he moved out. The witness spoke with Defendant a few days before the May 2007 incident with his wife. Defendant told him that he just got out of jail, was working with the Bishop and President of their church, and was upset that the witness had not told him that his wife did not want any contact with him . Defendant said that he did not blame his wife for testifying.

Officer William Martinez testified that he responded to a call on July 14, 2006 by going to Northwest Apartments. He met Elizabeth Pilling, who was upset, there. She told him what occurred and other officers located Defendant. He saw Ms. Pilling tell Defendant that he was "no longer welcome at Northwest Apartments." She told him that she did not want him contacting her in any way.

Candace Baldwin Comer testified that she met Defendant several years earlier at a church function. She "just wanted friendship;" but he wanted "a little more." They were friends for one to one and one-half years. He kept telling her he loved her; she kept: telling him, "you gotta slow down here." The Court overruled Defendant's objection. On October 31, 2005, she encountered Defendant on campus. He grabbed her backpack, and threw her down and held her down. He had wanted to talk and she had wanted to be left alone. Many people were around. She later got emails from "Melissa" who went to her church. "Melissa" asked if it was ok if she went out with Defendant. She later learned that "Melissa" was Defendant. She testified against

4

Defendant in his previous aggravated stalking trial. She spoke with Elizabeth Pilling regarding the emails.

Anton Jensen testified that he is a chemistry professor at CMU and the lay bishop for the Mt. Pleasant Mormon congregation. He acted as a counselor for members of the congregation. He knew Defendant and Elizabeth Pilling from church. He became aware of the PPO regarding Defendant and Ms. Pilling. Defendant mentioned it after he got out of jail (in early May of 2007) and Ms. Pilling also told him about it. Over Defendant's objection, he stated that "broadly, [Defendant] was not a member in good standing" of the congregation.

At the church cleanup, he talked with Defendant. He then saw Elizabeth and told Defendant that he might be in violation of the PPO and enoouraged him to leave. Defendant was frustrated with the PPO and having to leave. Defendant did not leave immediately; he did not leave for at least 5-10 minutes. The witness believed that he spoke with Defendant again about the PPO before Defendant left. He did not see Defendant leave. When he first talked with Defendant that night, both were looking at Elizabeth. He did not see Defendant walk toward Elizabeth after either conversation with him.

Jerry DiMaria testified that he knew Defendant and Elizabeth Pilling from church. He knew about the PPO regarding them. On May 23rd, he was at the church when the cleanup was going on. Ms. Pilling approached him and told him that either Defendant had to leave or she had to leave. The witness said that Defendant "probably" had to leave. He went and told Anton Jensen and thought that he also talked with Defendant.

Derrek Hentie testified that he was at the church with Mr. DiMaria that night. Ms. Pilling approached them and said that either he goes or I go. He did not know Defendant.

Defendant testified that he is 48 years old, and belongs to the Church of the Latter Day Saints. He attended CMU to earn a master's degree. He lived at the Northwest Apartments; the Pillings were his apartment managers there. He had been engaged to Candace Baldwin. He had emailed Elizabeth to explain his relationship with Candace; he felt bad about the assault. On the day of the verdict in the trial involving Candace, the Court took a lunch break and he went to Ms. Pilling's apartment. He was upset about what had happened in court, but was not upset at her. She closed the door and he left. He was told by her and by police not to come there any more. He had been served with the PPO regarding her.

On May 23rd, he wanted to speak with Bishop Jensen. He went to the church in the evening and observed the cleanup. He did not see Ms. Pilling or her husband there.

5

He talked with others and helped with the cleanup. He ate some food after Bishop Jensen's invitation.

He first became aware that Ms. Pilling was there when Bishop Jensen told him that she had arrived and he had to leave. He did not tell Defendant where Ms. Pilling was or that she had seen him. He walked to the sidewalk to look around, then saw her. He then went to the bike rack where he had left his bicycle. He waited there, and thought that she would go inside the church. He only saw her once. The Bishop told him to leave a second time. He rode his bike home.

He had not gone to the church to confront Ms. Pilling. He did not know her schedule and did not know that she would be at the church. He did not feel any hostility toward Ms. Pilling. He was asked about a web posting on the evening of July 14, 2006, stating that "Liz turned completely against" him and "became hateful toward" him for what "he put her through."

Defendant was convicted as charged, and sentenced.

Pet. App. Brf., pp. 1-9 (transcript citations omitted).

After sentencing, Petitioner filed an appeal of right with the Michigan Court of Appeals raising the following claims:

I. He was denied the effective assistance of counsel when trial counsel failed to object to the jury instructions. Specifically, he claims that his action of going to church to seek religious counseling was a constitutionally protected action that did not meet the definition of aggravated stalking under the statute.

II. The trial court erred when it sentenced him as a second habitual offender because he had not been convicted of the first offense when the second offense occurred.

The court denied relief on those claims and affirmed Petitioner's conviction and sentence. *Elliott, supra*. The court also denied reconsideration. *People v. Elliott*, No. 283910 (Mich. Ct. App. Aug. 11, 2009) (unpublished). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, which was denied in a standard order. *People v. Elliott*, 485 Mich. 1101, 778 N.W.2d 233 (2010).

6

Petitioner thereafter filed his federal habeas petition raising the same claims presented to the state courts on direct appeal of his conviction. Respondent has filed an answer to the petition contending that it should be denied for lack of merit. Petitioner has filed a reply to that answer.

### III. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this case because Petitioner filed his petition after the AEDPA's effective date. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case."

7

*Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, _ U.S. _, 130 S. Ct. 1855, 1862 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The Supreme Court recently held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003)). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain habeas relief in federal court, a state prisoner must show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme

Court at the time the state court renders its decision. *See Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

A state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is "limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## IV. Discussion

### A. Effectiveness of Trial Counsel

Petitioner first asserts that he is entitled to habeas relief because trial counsel was ineffective for failing to object to the jury instructions. Specifically, he claims that counsel failed to object to jury instructions "which effectively ignored" his primary argument that he went to the church on the night in question to seek counseling and exercise his constitutional right to worship.

The United States Supreme Court has established a two-prong test for determining whether a habeas petitioner has received the ineffective assistance of counsel. First, a petitioner must prove that counsel's performance was deficient. This requires a showing that counsel made errors so serious that he or she was not functioning as counsel as guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, the petitioner must establish that counsel's deficient performance prejudiced the defense. Counsel's errors must have been so serious that they deprived the petitioner of a fair trial or appeal. *Id.*

As to the performance prong, a petitioner must identify acts that were "outside the wide range of professionally competent assistance" in order to prove deficient performance. *Id.* at 690. The reviewing court's scrutiny of counsel's performance is highly deferential. *Id.* at 689. Counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. The petitioner bears the burden of overcoming the presumption that the challenged actions were sound trial strategy. *Id.* at 689.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one that is sufficient to undermine confidence

in the outcome. *Id.* "On balance, the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [proceeding] cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

The Supreme Court has recently confirmed that a federal court's consideration of ineffective assistance of counsel claims arising from state criminal proceedings is quite limited on habeas review due to the deference accorded trial attorneys and state appellate courts reviewing their performance. "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 131 S. Ct. at 788 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Id.* at 788.

Citing the *Strickland* standard, the Michigan Court of Appeals denied relief on this claim, ruling that the jury instructions were proper such that trial counsel was not ineffective for failing to challenge them. The court explained in relevant part:

> In the instant matter, the trial court instructed the jury on both aggravated stalking and the lesser-included offense of stalking, as follows:
>
>> The Defendant is charged with aggravated stalking. To establish this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt. First, that the Defendant committed two or more willful, separate and noncontinuous acts of unconsented contact with Elizabeth Pilling.
>>
>> Second, that the contact would cause a reasonable individual to suffer emotional distress.
>>
>> Third, that the contact caused Elizabeth Pilling to suffer emotional distress.

11

> Fourth, that the contact would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed and or molested.
>
> Fifth, that the contact caused Elizabeth Pilling to feel terrorized, frightened, intimidated, threatened, harassed and or molested.
>
> Sixth, the stalking was committed in violation of a court order or of a restraining order of which the Defendant had actual notice, or was a second or subsequent stalking offense. In considering whether the stalking was committed in violation of a court order or of a restraining order of which the Defendant had actual notice, the term unconsented contact is limited to following Ms. Pilling, which is the conduct prohibited in the restraining order.
>
> You may consider ... the lesser offense of stalking. To establish this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt.
>
> First, that the Defendant committed two or more willful, separate and noncontinuous acts of unconsented contacts with Elizabeth Pilling.
>
> Second, that the contact would cause a reasonable individual to suffer emotional distress.
>
> Third, that the contact caused Elizabeth Pilling to suffer emotional distress.
>
> Fourth, that the contact would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed and or molested.
>
> And, fifth, that the contact caused Elizabeth Pilling to feel terrorized, frightened, intimidated, threatened, harassed and or molested.

These instructions are consistent with CJI2d 17.25. In addition, the trial court provided the following statutory definition of harassment:

> [H]arassment means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress.

> Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose. [*See* MCL 750.411h(1)(c) (emphasis added).]

Defendant complains that these instructions were insufficient because they did not instruct the jury that it had to find "harassment" to find all the offense's elements proven beyond a reasonable doubt, and, in effect, prevented the jury from considering his defense that he was at the church to engage in a constitutionally protected activity. We are not of the same opinion. Rather, in our view, the trial court provided sufficient instructions to the jury that fairly apprised it of the applicable law. It is true that "a defendant in a criminal trial is entitled to have a properly instructed jury consider the evidence against him or her." *People v. Dobek*, 274 Mich. App. 58, 82, 732 N.W.2d 546 (2007). Accordingly, a trial court is required to instruct the jury in the applicable law and fully and fairly present the case to the jury in an understandable manner. *People v. Rodriguez*, 463 Mich. 466, 472–473, 620 N.W.2d 13 (2000). This is necessary so that the factfinder can correctly and intelligently decide the case. *Id.* "Jury instructions must include all the elements of the offenses charged against the defendant and any material issues, defenses, and theories that are supported by the evidence." *Dobek, supra* at 82, 732 N.W.2d 546. "Even if the instructions are somewhat imperfect, reversal is not required as long as they fairly presented the issues to be tried and sufficiently protected the defendant's rights." *People v. Aldrich*, 246 Mich. App. 101, 124, 631 N.W.2d 67 (2001).

Here, the trial court informed the jury of all the elements of the offense. The trial court then informed the jury that the definition of "harassment" does not include constitutionally protected activity or conduct that serves a legitimate purpose. These instructions fairly presented the issues and encompassed defendant's theory of the case, thereby sufficiently protecting his rights. *See id.* Under the circumstances, the instructions were proper. As a result, any objection to these instructions would have been futile. Counsel cannot be ineffective for failing to raise a futile objection. *People v. Ackerman*, 257 Mich. App. 434, 455, 669 N.W.2d 818 (2003). Accordingly, defendant's ineffective assistance claim is unavailing.

*Elliott*, 2009 WL 1717386 at *1-3.

The Michigan Court of Appeals' decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. The court concluded that the jury instructions were proper under Michigan law. That decision is entitled to deference on federal habeas review. State courts are the final arbiters of state law and federal courts will not intervene in

such decisions. *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987). Given the Michigan Court of Appeals' ruling that the jury instructions were proper, Petitioner cannot establish that trial counsel was deficient or that he was prejudiced by counsel's performance. Defense counsel cannot be deemed deficient for failing to make a futile objection or motion. *See United States v. Steverson*, 230 F.3d 221, 225 (6th Cir. 2000). Moreover, the record reveals that trial counsel presented evidence in support of Petitioner's defense at trial, discussed the elements of the charged offense and the definition of harassment, and thoroughly argued the defense theory of the case before the jury. Petitioner has failed to establish that trial counsel was ineffective under the *Strickland* standard.

Furthermore, in order for habeas relief to be warranted on the basis of incorrect jury instructions, a petitioner must show more than that the instructions are undesirable, erroneous or universally condemned; rather, taken as a whole, they must be so infirm that they rendered the entire trial fundamentally unfair. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly. *See Binder v. Stegall*, 198 F.3d 177, 179 (6th Cir. 1999). A jury instruction is not to be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial court record. *See Grant v. Rivers*, 920 F. Supp. 769, 784 (E.D. Mich. 1996).

In this case, the trial court properly instructed the jury on the elements of the charged offense of aggravated stalking, the lesser offense of stalking, the definition of harassment and its exclusion for constitutionally-protected or other legitimate activity, and other relevant matters. The court's instructions, particularly when considered as a whole, sufficiently apprised the jury of the pertinent

issues to be determined at trial. Petitioner has not shown that the jury instructions were erroneous, that there is a reasonable likelihood that the jury misapplied the instructions, or that the instructions otherwise rendered his trial fundamentally unfair. Habeas relief is not warranted on this claim.

### B.   Habitual Offender Sentence

Petitioner also asserts that he is entitled to habeas relief because the state trial court erred in sentencing him as a second habitual offender. Specifically, he contends that his habitual offender enhancement is improper because he had not been convicted of another felony when the charged offense occurred.

As an initial matter, the Court notes that Petitioner's sentence is within the statutory maximum. A sentence within the statutory limit is generally not subject to federal habeas review. *See Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999). Claims which arise out of a state court's sentencing decision are not normally cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law. *See Lucey v. Lavigne*, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001). Petitioner has made no such showing. His sentence is within the statutory maximum set by state law and is authorized by state law. *See* MICH. COMP. LAWS §§ 750.411i, 769.10; *see also People v. Gardner*, 482 Mich. 41, 753 N.W.2d 78 (2008).

Furthermore, to the extent that Petitioner asserts that his habitual offender sentence is improper under state law, he is not entitled to federal habeas relief. It is well-settled that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting on habeas review." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see also Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975) (state courts are the final arbiters

15

of state law); *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002). Any challenge to the Michigan Court of Appeals' interpretation of the habitual offender statute is thus not cognizable on federal habeas review. As noted, state courts are the final arbiters of state law and the federal courts will not intervene in such matters. *Lewis*, 497 U.S. at 780; *Oviedo*, 809 F.2d at 328. Habeas relief does not lie for perceived errors of state law. *Estelle*, 502 U.S. at 67-68.

Lastly, even assuming that Petitioner states a cognizable claim, he has failed to demonstrate that his habitual offender sentence is invalid. In denying relief on this claim, the Michigan Court of Appeals found Petitioner's contention to be inaccurate. The court explained:

> Defendant next argues that because his prior conviction did not precede the current offense, it could not be used to enhance his sentence under MCL 769.10. We disagree. There is no merit to defendant's contention because it is factually inaccurate. Our review of the record shows that defendant has a prior conviction, dated July 14, 2006, and was convicted of the underlying offense on January 15, 2008. The fact that his current conviction is premised on some events that preceded his prior conviction is immaterial under the habitual offender statute. *See People v. Gardner*, 482 Mich. 41, 44, 753 N.W.2d 78 (2008). The trial court's decision to sentence defendant as a second habitual offender under MCL 769.10 was not erroneous.

*Elliott*, 2009 WL 1717386 at *3. This decision is neither contrary to Supreme Court precedent nor an unreasonable application thereof. The record demonstrates that Petitioner's prior conviction was entered on July 14, 2006. While he had some contact with the victim in this case before that date, he had contact with her on that date and afterward as well. The victim obtained a personal protection order against him in August, 2006 and the church incident occurred on May 23, 2007. The conviction at issue in this case was entered on January 15, 2008. Consequently, Petitioner's claim that his prior conviction did not precede the current offense is belied by the record. Petitioner

has failed to show that his habitual offense is invalid or unconstitutional. Habeas relief is not warranted on this claim.

## V. Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition and that the petition for a writ of habeas corpus must be denied.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits of the claims. *Id.* at 336-37.

Having conducted the requisite review, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims. A certificate of appealability is not warranted. The Court further concludes that Petitioner should not be granted leave to proceed *in forma pauperis* on appeal as any appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

has failed to show that his habitual offense is invalid or unconstitutional. Habeas relief is not warranted on this claim.

## V. Conclusion

For the reasons stated, the Court concludes that Petitioner is not entitled to federal habeas relief on the claims contained in his petition and that the petition for a writ of habeas corpus must be denied.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a court denies relief on the merits, the substantial showing threshold is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000). "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, a court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits of the claims. *Id.* at 336-37.

Having conducted the requisite review, the Court concludes that Petitioner has failed to make a substantial showing of the denial of a constitutional right as to his habeas claims. A certificate of appealability is not warranted. The Court further concludes that Petitioner should not be granted leave to proceed *in forma pauperis* on appeal as any appeal cannot be taken in good faith. *See* Fed. R. App. P. 24(a).

Accordingly;

**IT IS ORDERED** that the petition for a writ of habeas corpus is **DENIED** and **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that a certificate of appealability and leave to proceed *in forma pauperis* on appeal are **DENIED**.

 

PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

DATED: 3-14-12